ZINTER, Justice
(concurring specially).
[¶25.] SDCL 10-45-12.1 is a lengthy listing of sales tax exemptions. The Legislature used different language in the statute to describe two types of exemptions. In the first, the Legislature exempted specifically described “services” performed by “establishments” referenced in the SIC. Representative examples include “health services,” “educational services,” “social services,” “agricultural services,” “forestry services,” and “trucking and courier services.” See SDCL 10-45-12.1.[3] In the second, the Legislature more broadly exempted entire “establishments” or “industries.” *408 Representative examples of those exemptions include “establishments” primarily engaged in river transportation, “establishments” primarily engaged in air transportation, certain centrally assessed corporations, water supply and sewage system “industr[ies],” security and commodity “brokers” and “dealers,” and “credit and collection agencies.” See id.
[¶ 26.] The statutory language at issue in this case is of the second type exempting pipeline establishments. See id. (exempting “pipe lines, except natural gas (major group 46)”). Unlike the first exemption for specifically described services, the Legislature did not limit the “pipe line” exemption to any particularly described service provided by pipelines. See id. Because the Legislature chose to exempt pipeline establishments rather than any particular service they provide,[4] and because there is no dispute that Magellan’s economic activity falls within major group *409 46 (pipeline establishments), Magellan is entitled to the exemption for the pipeline services it provides. Further, because the Department does not dispute that additive injection and equipment calibration are services provided by pipelines, those services are exempt.
[¶ 27.] Had the Legislature intended to exempt only the “transportation” services provided by pipelines, the Legislature would have used the word “transportation” in a specifically described service exemption, as it did throughout most of SDCL 10-45-12.1. Any question about legislative intent is resolved by examining the Legislature’s treatment of other establishments.
[¶ 28.] The Legislature’s comparative treatment of petroleum and natural gas pipelines is especially significant. In contrast to the establishment exemption provided for petroleum pipelines, the Legislature used the particularly described service exemption for natural gas pipelines. As previously noted, SDCL 10-45-12.1 has no language limiting the exemption for petroleum pipelines as long as they are classified in “major group 46.” But when the Legislature decided to exempt natural gas pipelines, it used the particularly described service language, only exempting “[t]he provision of natural gas transportation services by a pipeline.” SDCL 10-45-67 (emphasis added). And this is not the only example of the Legislature’s decision to use the more limited and particularly described service exemption when it desired to restrict an establishment’s exemption to a particular service. See SDCL 10-45-12.1 (limiting an exemption to “credit counseling services provided by individual and family social services”). Thus, when the Legislature has intended to limit an establishment’s exemption to a particular service, whether in SDCL 10-45-12.1 or in a separate statute, it has done so. But in the case of petroleum pipelines, the Legislature chose not to limit the exemption to transportation services.
[¶ 29.] The dissent would deny an exemption in this case, but it does so only by adding the words “transportation services” to the pipeline establishment exemption statute. The dissent correctly notes that major group 46 “includes establishments primarily engaged in the pipeline transportation of petroleum or other commodities[.]” See SIC Manual at 279. But the dissent then incorrectly relies on other SIC Manual language indicating that where “distinct and separate” “economic activities” are provided at a single physical location, each activity should be classified as a separate “establishment” (presumably with different, non-exempt classification numbers).[5] See Dissent ¶¶ 42-43 (con- *410 eluding that there is no evidence that a petroleum pipeline injects additives and calibrates its equipment as a part of its service of transporting petroleum, and no industry classification has been cited to include each of those activities).
[¶ 30.] There are two errors in the dissent’s analysis. First, to qualify for the SIC major group 46 exemption, each service provided by a petroleum pipeline need not be classified as an “establishment ‘primarily engaged in the pipeline transportation of petroleum.’ ” The SIC Manual provides that “[e]ach operating establishment is assigned an industry code on the basis of its primary activity, which is determined by its principal ... services rendered.” SIC Manual at 15 (emphasis added). Consequently, to qualify for exempt classification in major group 46, the establishment need only be “primarily” engaged in the pipeline transportation of petroleum. See id. at 279. And by basing classification on an establishment’s primary activity and principal service rather than each included service, the SIC Manual recognizes that the primary activity controls even though other services may be provided.
[¶ 31.] Nevertheless, the dissent contends that separate classifications are required because the SIC Manual requires separate classification where “no one industry description in the classification includes ... combined activities]]]” and “the employment in each ... economic activity is significant.” See Dissent ¶¶ 41-42 (emphasis added) (citing SIC Manual at 12). The Department has not made this argument on appeal, and the dissent errs in relying on this language because neither test is satisfied in this case.
[¶ 32.] The first test is not satisfied because major group 46 classification describes the combined activities that Magellan provides. The dissent contends that there is no evidence that additive injection and equipment calibration services are part of Magellan’s primary service of transporting petroleum. But the stipulated facts reflect that those services are a necessarily included part of the services Magellan provides in transporting petroleum products. The stipulation reflects that when petroleum products are transported in interstate pipelines, the petroleum products are fungible, and Magellan must inject them with additives[6] at the time its customers take delivery of the individual products at the terminal rack. Those additive services are necessarily combined because some of the additives are “end-product components” that are “mandated” to be injected under state and federal law. Stipulated Facts ¶¶ 19-21. Other additives must be injected to differentiate between proprietary brands or to enhance diesel performance.[7] Id.
*411 [¶ S3.] The second test is not satisfied because there is no dispute that the additive injection and related equipment calibration services are a relatively insignificant part of Magellan’s pipeline services. This is a 9,500 mile pipeline crossing thirteen states in its transportation of petroleum from refineries throughout the country to fifty-one terminals, including those in South Dakota. But the additives are injected only at the very end of that journey when the petroleum products are being loaded into the customer’s trucks as they leave the terminals. Because the injection and calibration services are a relatively insignificant part of a pipeline’s economic activity, and because major group 46 describes those combined services, the “distinct and separate economic activity” test is not satisfied. Therefore, the SIC Manual provides no basis to require separate industry codes for the injection and calibration services Magellan necessarily includes in its transportation of petroleum products.
[¶ 34.] Entitlement to a tax exemption must be based on the language of the statute. Sioux Falls Shopping News, Inc. v. Dep’t of Revenue & Regulation, 2008 S.D. 34, ¶ 26, 749 N.W.2d 522, 527 (noting that a court may not include language in the tax statutes that the Legislature did not employ). The Legislature limited the natural gas pipeline exemption to “transportation services,” but the Legislature did not use (or incorporate by reference) any language limiting the petroleum pipeline exemption to “transportation” or any other particular service. Instead, the Legislature broadly exempted petroleum “pipe line” establishments from sales taxation. Because the Department agrees that Magellan is a petroleum pipeline establishment that falls within major group 46, there is no statutory basis to limit Magellan’s exemption to any of the pipeline services it provides. And because the injection and calibration services are pipeline services provided by an establishment classified in major group 46, the services are exempt under SDCL 10-45-12.1.
[¶ 35.] KERN, Circuit Court Judge, joins this special writing.

. SDCL 10-45-12.1 provides:
The following services enumerated in the Standard Industrial Classification Manual, 1987, as prepared by the Statistical Policy Division of the Office of Management and Budget, Office of the President are exempt from the provisions of this chapter: health services (major group 80); educational services (major group 82) except schools and educational services not elsewhere classified (industry no. 8299); social services (major group 83); agricultural services (major group 07) except veterinarian services (group no. 074) and animal specialty services, except veterinary (industry no. 0752); forestry services (group no. 085); radio and television broadcasting (group no. 483); railroad transportation (major group 40); local and suburban passenger transportation (group no. 411) except limousine services; school buses (group no. 415); trucking and courier services, except air (group no. 421) except collection and disposal of solid waste; farm product warehousing and storage (industry no. 4221); establishments primarily engaged in transportation on rivers and canals *408 (group no. 444); establishments primarily engaged in air transportation, certified carriers (group no. 451); establishments primarily engaged in air transportation, noncertified carriers (group no. 452) except chartered flights (industry no. 4522) and airplane, helicopter, balloon, dirigible, and blimp rides for amusement or sightseeing; pipe lines, except natural gas (major group 46); arrangement of passenger transportation (group no. 472); arrangement of transportation of freight and cargo (group no. 473); rental of railroad cars (group no. 474); water supply (industry no. 4941); sewerage systems (industry no. 4952); security brokers, dealers and flotation companies (group no. 621); commodity contracts brokers and dealers (group no. 622); credit counseling services provided by individual and family social services (industry no. 8322); construction services (division C) except industry no. 1752 and locksmiths and locksmith shops; consumer credit reporting agencies, mercantile reporting agencies, and adjustment and collection agencies (group no. 732), if the debt was incurred out-of-state and the client does not reside within the state. The following are also specifically exempt from the provisions of this chapter; financial seivices of institutions subject to tax under chapter 10-43 including loan origination fees, late payment charges, nonsufficient fund check charges, stop payment charges, safe deposit box rent, exchange charges, commission on travelers checks, charges for administration of trusts, interest charges, and points charged on loans; commissions earned or service fees paid by an insurance company to an agent or representative for the sale of a policy; seivices of brokers and agents licensed under Title 47; the sale of trading stamps; rentals of motor vehicles as defined by § 32-5-1 leased under a single contract for more than twenty-eight days; advertising services; services provided by any corporation to another corporation which is centrally assessed having identical ownership and services provided by any corporation to a wholly owned subsidiaty which is centrally assessed; continuing education programs; tutoring; vocational counseling, except rehabilitation counseling; and motion picture rentals to a commercially operated theater primarily engaged in the exhibition of motion pictures.
(Emphasis added.)

. The dissent opines that there are not two types of exemptions, suggesting that there is no establishment exemption. The dissent reasons that "the Legislature simply took the language used by the SIC and chose which services it intended to allow service exemptions.” See Dissent ¶ 39. But this disregards the clear difference in the statutory language describing each exemption. Moreover, the SIC Manual "was developed for use in the classification of establishments by the type of activity in which they are engaged[J” SIC Manual at 11 (emphasis added). And establishments are defined as "an economic unit ... where business is conducted or where services or industrial operations are performed.” Id. at 12 (emphasis added). Therefore, the SIC Manual also recognizes the distinction between a business establishment and the services it may provide. Because the SIC Manual incorporates this distinction, one cannot simply sweep aside the Legislature's decision to in some cases use language exempting entire establishments without qualification, but in other cases use language limiting the ex *409 emption to a particular service provided by a classified establishment.

. The Department makes a closely related argument based on our decisions in Mauch v. South Dakota Department of Revenue & Regulation, 2007 S.D. 90, ¶¶ 9-24, 738 N.W.2d 537, 540-44, Cooperative Agronomy Services v. South Dakota Department of Revenue, 2003 S.D. 104, ¶¶ 14-15, 668 N.W.2d 718, 722-23, and similar decisions. The Department points out that in those cases, we noted that taxability is based on the transaction and not the classification or primary business of the taxpayer. But in the Department’s cases, the issue involved the taxpayer’s entitlement to a particular classification. The "SIC Manual [is used under the statutory scheme] in order to determine the proper classification.” Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc. v. S.D. Dep’t of Revenue, 2002 S.D. 145, ¶ 7, 654 N.W.2d 779, 783. Therefore, in the Department's cases, it was necessary to focus on the transactions to determine whether the entity fit within the claimed classification. Here, there is no dispute that Magellan is classified as a pipeline in major group 46. Therefore, the "transaction” cases are not helpful.
The Department’s reliance on "predominant activity” cases is also misplaced. See, e.g., *410 TRM ATM Corp. v. S.D. Dep’t of Revenue & Regulation, 2010 S.D. 90, ¶ 9, 793 N.W.2d 1, 4 ("[I]n analyzing the taxability of a service, the dispositive inquiry focuses on the predominant activity in the transaction between those parties who exchange consideration for the service.”). Here, Magellan satisfies that test because there is no dispute that Magellan’s primary activity involves the transportation of petroleum products. Moreover, the predominant activity test is used in applying SDCL 10-45-4.1, a statute that has a different purpose; i.e., to define a "service.” Here, there is no dispute that Magellan’s injection and calibration activities are services.

. Equipment calibration services are necessary to monitor the additive injections.

. The specific additives that must be injected at the rack include gasoline detergent, diesel lubricity additive, diesel dye, jet fuel deicer, diesel cold flow improver, diesel detergent, and proprietary additives. Proprietary additives are required because pipelines provide the same fungible petroleum products to competing retailers. The products must be injected with proprietary additives at the pipeline *411 terminal so the products may be differentiated when sold at retail.